IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: * | |
| ALSON ALSTON, * | Chapter 11 |
| dba ALSTON BUSINESS CONSULTING * | |
| dba SONGHAI CITY, LLC * | Case No.: 1:14-BK-03454 MDF |
| dba SONGHAI ENTERPRISES, LLC * | |
| dba SONGHAI CITY * | |
|   ENTERTAINMENT, LLC * | |
| dba SONGHAI CITY REAL ESTATE, * | |
|   LLC * | |
| dba ENCORE GENERAL * | |
|   MERCHANDISE, LLC * | |
| dba ENCORE GENERAL STORE * | |
| dba DRAGON MANAGEMENT * | |
|   SERVICES * | |
| aka AL ALSTON, * | |
|     Debtor. * | |

## OPINION

Debtor Alson Alston ("Debtor") filed a Sixth Amended Disclosure Statement and Plan of Reorganization on August 26, 2016. Objections to the Disclosure Statement, the Plan or both were filed by Deutsche Bank National Trust Company ("Deutsche Bank"), Bayview Loan Servicing, LLC ("Bayview"), AS Peleus, LLC ("AS Peleus"), Ocwen Loan Servicing, LLC for Wells Fargo Bank ("Ocwen"), LSF9 Master Participation Trust ("LSF9"), and JP Morgan Chase Bank ("Chase Bank"). After a preliminary hearing on October 18, 2016, an evidentiary hearing was scheduled for November 29, 2016. In the order setting the hearing, I stated that if Debtor intended to file a further amended disclosure statement and plan to address the numerous objections to his Sixth Amended Disclosure Statement and Plan, the documents had to be filed on or before November 22, 2016. I also issued orders directing Debtor to appear and show cause why the case should not be dismissed or why the case should not be transferred to the Bankruptcy Court for the Eastern District of Pennsylvania. Having considered the evidence

presented at the hearing and the arguments of the parties, I have concluded that dismissal of the case is warranted.[1]

## I. Procedural History and Background

Debtor filed his pro se petition under Chapter 11 of the Bankruptcy Code on July 28, 2014. At the time, Debtor was a student at the Dickinson School of Law and resided in Carlisle, Pennsylvania, the basis for venue in the Middle District. Debtor requested and received approval to pay the filing fee in installments. When he filed his petition, Debtor did not include the required schedules and statements. The Clerk issued a deficiency notice directing Debtor to immediately file a list of the 20 largest unsecured creditors and the certificate of credit counseling[2] and to file the other schedules and statements required by 11 U.S.C. § 521 no later than August 11, 2014. On August 9, 2014, Debtor requested an extension of time to file the required schedules and statements, and I granted Debtor an extension until August 28, 2014. Debtor filed his schedules by the deadline.

---

[1]This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a non-*Stern* core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (L). This Opinion constitutes findings of fact and conclusions of law made pursuant to Fed.R.Bankr.P. 7052.

[2]On Exhibit D of his petition, Debtor certified under penalty of perjury that he had received credit counseling within the 180 days before he filed his bankruptcy case, but that he did not have a certificate when he filed his petition. On August 28, 2014, Debtor filed a certificate of credit counseling (Doc. # 23), which certifies that Debtor received credit counseling on August 12, 2014. Contrary to the statement on Exhibit D, Debtor did not receive credit counseling until *after* he filed his petition. Section 109(h) of the Bankruptcy Code provides that an individual may not be a debtor unless credit counseling is obtained during the 180-day period *before* the petition is filed. Accordingly, although there are ample other grounds for dismissing the case, Debtor's petition must be dismissed for his failure to obtain prepetition credit counseling because he is ineligible to be a debtor.

2

Debtor reported on Schedule A that he owns eight parcels of developed real estate and an interest in an LLC that owns an undeveloped lot. One property is located in Manhattan in the City of New York and the remaining properties are located in the City of Philadelphia. Debtor valued the properties on Schedule A at $1.8 million.

On Schedule D[3] he listed three loans owed to Bayview secured by mortgages on 2827 W. Girard Avenue, 2834 W. Girard Avenue, and 3117-27 Master Street, Philadelphia. He listed AS Peleus as holding a claim of $200,000 secured by property located at 2836-38 W. Girard Avenue, Philadelphia and Deutsche Bank as holding a claim of $260,000 secured by property located at 4904 Monument Road, Philadelphia. He listed a property located at 2825 W. Girard Avenue as subject to a $160,000 mortgage held by LSF9 and a property at 3033 Baltz Street subject to an Ocwen mortgage of $90,000. He also listed Chase as holding a claim for $735,000 and Residential Funding Mortgage Securities II, Inc. ("Residential") as holding a claim for $105,000. Both claims are secured by property located at 431 W. 146th Street, New York. He listed all the liens secured by real estate as disputed except the mortgages held by Chase and Ocwen. Debtor also holds an interest in an unnamed LLC that owns a lot at 3029-31 W. Glenwood Avenue. The Glenwood Avenue property is not subject to a mortgage, but Debtor later stated in documents filed in the case that the property was subject to a $51,000 lien for the cleanup of a collapsed wall. Debtor's schedules do not specify who holds the lien.

---

[3]Several of the secured claims have changed hands since the mortgage was originated and even during the course of the bankruptcy case. To minimize confusion, I will use the name of the creditor asserting the claim at the time of the November 30, 2016 hearing although the claimants vary from those reported on Schedule D in some instances.

3

Debtor did not specify on Schedule D which of the properties were subject to municipal liens for real estate taxes, water and sewer, and business taxes, but he did list secured claims of the City of Philadelphia for business taxes of $45,000 and for real estate taxes of $32,750. He further indicated that the Philadelphia Water Department had secured claims of $31,000.[4]

Debtor filed his original Plan of Reorganization and Disclosure Statement on April 6, 2015, eight months after he filed his petition. His first plan had numerous deficiencies. For example, it did not address administrative claims, it attempted to define some secured claims as "impaired as to interest but not principal," and it attempted to reserve several undefined classes of unsecured claims. The disclosure statement with the plan was likewise deficient and provided little information that would enable a creditor to vote on the plan.

A hearing on the disclosure statement was set for June 2, 2015. Numerous creditors and the United States Trustee filed objections to the disclosure statement and/or the plan prompting Debtor to file a First Amended Disclosure Statement and First Amended Plan of Reorganization on June 1, 2015. Debtor apparently was under the impression that although he had filed these amended documents immediately before the hearing and had included numerous attachments, the hearing on the First Amended Disclosure Statement would proceed although the parties had not received notice of the new disclosure statement and plan.

At the June 2 hearing, I directed Debtor to either file a Second Amended Disclosure Statement and Plan within thirty days incorporating the information he had filed shortly before

---

[4]The City of Philadelphia filed two proofs of claim asserting a total secured claim of $106,368.18 and a priority unsecured claim of $42,280.43. Debtor and the City settled their dispute over the claims in an agreement to be incorporated into the plan.

4

the hearing or notify the Clerk to notice for hearing the First Amended Disclosure Statement and Plan. Debtor elected to proceed with the Second Amended Disclosure Statement and Plan.

Debtor filed six further amended disclosure statements and plans, each of which was followed by a barrage of objections from secured creditors and occasionally tax claimants. Debtor added more information with each installment, but it often was presented in a confusing manner by incorporating attachments and referring to earlier documents. Often the attachments were inconsistent with each other or with the main body of the disclosure statements and plans. Extensive energy was devoted to creating complex spreadsheets and charts to support future income and expense projections, but little evidence was provided, such as appraisals or complete financial statements, to support the rosy projections.

All of the disclosure statements suffered at least two fatal flaws. They provided inadequate support for the values attributed to the various parcels of real estate owned by Debtor, which was necessary to prepare a meaningful liquidation analysis. Second, they failed to include a complete budget of income and expenses, particularly expenses related to real property management. Information was provided on obligations paid, but no information was provided on the numerous unpaid obligations accruing each month.

Debtor was unable to reference information from the monthly operating reports ("MORs") because they seldom were filed timely and typically were incomplete.[5] As the United

---

[5]I take judicial notice and admit into evidence for purposes of this Opinion the following docketed items: (1) orders entered in this case that have become final; (2) schedules and statements filed by Debtor; (3) each disclosure statement and plan filed by Debtor including all attachments and all amended and modified versions of earlier statements and plans; and (4) all filed MORs. I also take judicial notice of MORs filed in the case and all schedules and statements as admissions of Debtor. *See In re Brutsche,* 476 B.R. 298, 305 n.12 (Bankr. D.N.M. 2012) (stating that court may take judicial notice of filed monthly operating reports and treat

5

States Trustee observed in his objection to Debtor's "Corrected Third Amended Disclosure Statement" filed on November 12, 2015, Debtor did not file complete MORs for June, July, August, and September 2015. The documents submitted for each period consisted only of a one-page summary of cash flows for the month. Debtor subsequently submitted a Fifth Amended Disclosure Statement and Plan on April 25, 2016 and a "Corrected" Fifth Amended Disclosure Statement and Plan on May 4, 2016. After Debtor filed a motion to delay the hearing on the Fifth Amended Disclosure Statement, I entered an order continuing the hearing to July 12, 2016, but further ordered the Debtor to show cause why the case should not be dismissed for cause under 11 U.S.C. § 1112(b)(4)(J) if a plan was not confirmed by September 1, 2016.

At the July 12 hearing I conducted an extensive colloquy with Debtor emphasizing that after several failed attempts, it was imperative that Debtor submit a disclosure statement that clearly and fully described his current financial situation and his plan for reorganization. Focusing on the most significant objections raised to the Fifth Amended Disclosure Statement, I emphasized that a further amended disclosure statement should clearly address three issues raised in the objections.

First, Debtor admitted that the Baltz Street property did not benefit the estate. Therefore, any further disclosure statement should state that Debtor either would surrender the property and concur in the lifting of the automatic stay, or that Debtor would submit the required documentation to complete a deed in lieu of foreclosure. Second, the amended disclosure statement should specifically address the amount of real estate taxes and insurance required to be

---

them as admissions); *In re Harmony Holding, LLC*, 393 B.R. 409, 414 (Bankr. D. S.C. 2008) (stating that schedules and statements signed under penalty of perjury may be admitted as evidence).

6

paid for each property and not merely state that he was creating a reserve for mortgage-related expenses. Without this information it was impossible to gauge whether these expenses were adequately funded. Finally, I stated that he should clarify the provision addressing the creation of a "trust" for post confirmation payments to AS Peleus pending a final decision in the state court appeal.

When the Sixth Amended Disclosure Statement and Plan was filed none of these issues were addressed. LSF9 filed an objection to the disclosure statement and plan because its claim, having been filed a month earlier, was not addressed.[6] Deutsche Bank, Bayview, AS Peleus, Ocwen, and Chase also objected to the Sixth Amended Disclosure Statement. Debtor filed a response to the objections asserting that the information in the disclosure statement was adequate. He criticized the secured creditors who had failed to respond to a preliminary version of the disclosure statement and plan he had circulated for comments, characterizing their objections as an "ambush." Debtor disputed AS Peleus' objection to the valuation of the 2836-38 W. Girard Avenue property, dismissing the appraisal obtained by the creditor as "factually incorrect," but providing no appraisal of his own. He also dismissed Deutsche Bank's objection that the 4904 Monument Road property was not necessary to the reorganization because it produced no income. Debtor argued that the property was necessary to the reorganization because it is his mother's home.

These observations by Debtor demonstrate that he fails to understand two important aspects of a Chapter 11 reorganization. First, that when the values of assets are challenged by creditors whose claims are secured by those assets, a debtor must be prepared to provide

---

[6]Debtor has yet to request that a bar date for claims be set.

7

evidence as to how he arrived at the value, typically through the introduction of appraisal testimony. Debtor has not filed motions to value collateral as to any of the properties. He simply continues to assert that his values are correct and the values assigned by his secured creditors are not. Second, an individual Chapter 11 plan cannot be confirmed unless the debtor dedicates his projected disposable income to the plan or he pays all unsecured claims in full. *See* 11 U.S.C. § 1129(a)(15). Debtor does not propose to pay all unsecured claims in full, therefore all projected disposable income must be devoted to the plan. By maintaining a separate home for his mother that will undoubtedly require the payment of the allowed claim of the mortgage holder, real estate taxes, and insurance, Debtor is not committing all projected disposable income to his plan. A review of Debtor's MORs further supports this assertion. Almost every report includes "gifts," sometimes in the thousands of dollars, to unnamed parties while administrative claims go unpaid.

While each amended disclosure statement and plan submitted by Debtor has become more complex, after two years the disclosure statement continues to lack adequate information to demonstrate that the plan is sufficiently funded and that creditors will receive more in a Chapter 11 case than they would in a Chapter 7 case.

This is not to say that Debtor has not made progress in resolving a number of important issues in the case. He reached an agreement with the City of Philadelphia on the amounts and categorization of its tax and other municipal claims. After negotiations with Debtor, Chase withdrew its objection Debtor's Sixth Amended Disclosure Statement and Plan, and Residential

entered into a stipulation settling its claim.[7] Debtor and Bayview also were able to resolve a dispute over the secured and unsecured amounts of Bayview's claims secured by three of his properties. But as the case has dragged on, it has become apparent that Debtor cannot hope to reorganize without more lucrative employment and the sale or surrender of non-income producing properties.

When the hearing on the Sixth Amended Disclosure Statement was convened on October 18, 2016, Deutsche Bank, Bayview, AS Peleus, Ocwen, and LSF9 (hereinafter "Objecting Creditors")[8] continued to pursue their objections to the disclosure statement. After hearing the arguments of the parties, I determined that the objections could not be decided on argument alone and set an evidentiary hearing for November 29, 2016. The order setting the hearing also stated that if Debtor intended to file a Seventh Amended Disclosure Statement and Plan to address the objections to the Sixth Amended Disclosure Statement and Plan, it had to be filed by November 22, 2016 and that any objections to a further amended plan and disclosure statement had to be

---

[7]Chase, which holds the first mortgage on the New York City property, and Residential, which holds a second mortgage on the same property, ultimately were able to reach agreement with Debtor regarding the treatment of their claims in the Sixth Amended Disclosure Statement and Plan. Unlike Bayview, Deutsche Bank, and AS Peleus, Debtor does not propose to cram down their claims. At none of the prior hearings in this case did Debtor offer formal appraisal testimony about the value of any of the real property he owns, although several creditors challenged the values in Debtor's schedules. As to the New York property, the only evidence of value submitted was general information on cash flows from rentals. No party raised this issue, but I cannot help but wonder that if the New York property had been appraised using the sales comparison approach, it may have indicated significant equity above the balance of the loans secured by the mortgages on this property. Without an appraisal of property Debtor acquired approximately twenty years ago, it is impossible to perform an adequate liquidation analysis.

[8]Before the November 29, 2016 hearing, Chase withdrew its objection to Debtor's Sixth Amended Disclosure Statement and Plan.

9

filed by November 25, 2016.[9]

While secured creditors in the case continue to file objections to Debtor's proposed disclosure statements and plans, even after two years in Chapter 11, no party has filed a motion to convert or dismiss the case. Concerned that this cycle would continue unabated, I issued two orders to show cause – one directing Debtor to show cause why the case should not be transferred to the Eastern District of Pennsylvania[10] and the other to show cause why the case should not be dismissed. At the hearing on these motions, which was held concurrently with the hearing on the Sixth Amended Disclosure Statement, only Debtor opposed either dismissal of the case or transfer of venue to the Eastern District of Pennsylvania.

## II. Discussion

A bankruptcy court has the authority to dismiss a bankruptcy petition for cause under 11 U.S.C. § 1112(b) on its own motion. *Argus Group 1700, Inc. v. Steinman,* 206 B.R. 757, 763 (E.D. Pa. 1997); *In re Starmark Clinics, LP*, 388 B.R. 727, 736 (Bankr. S.D. Tex. 2008); *In re Spencer C. Young Inv./Courtyard of Chapel Hill, LLC,* No. 08-81852, 2009 WL 901654, at *4 (Bankr. M.D.N.C. Feb. 4, 2009); *see also In re Dr. R.C. Samanta Roy Inst. of Sci. Tech., Inc.*, 465 Fed. Appx. 93 (3d Cir. 2011) (holding that bankruptcy court did not abuse its discretion in dismissing case for cause after issuing order *sua sponte* directing debtor to show cause why its case should not be dismissed).

---

[9]Debtor faxed a Seventh Amended Disclosure Statement and Plan to the Court on November 23, 2016, thus, they were not timely filed.

[10]Debtor's only connection to the Middle District of Pennsylvania was his temporary residence in the district while he attended law school. He has not resided in the District since 2015.

Under § 1112(b)(4), a bankruptcy court must convert or dismiss a Chapter 11 case if among other grounds, any of the following exists:

> (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
> . . . .
> (F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;
> . . . .
> (I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief; . . .

11 U.S.C. § 1112(b)(4). The grounds set forth in § 1112(b) are illustrative, not exhaustive, and the Court should "consider other factors as they arise." *In re Brown,* 951 F.2d 564, 572 (3d Cir. 1991) *cited in In re Gateway Access Sols., Inc.*, 374 B.R. 556, 561 (Bankr. M.D. Pa. 2007). Once the court finds cause, the burden shifts to the debtor to demonstrate "unusual circumstances" such that dismissal or conversion would not be in the best interests of the estate and creditors. 11 U.S.C. § 1112(b)(2); *see In re Grasso*, 497 B.R. 448, 455 (Bankr. E.D. Pa. 2013) (stating that "unusual circumstances should relate to conditions that are not common in Chapter 11 cases [and] that explain why a plan is reasonably likely to be confirmed within a reasonable period of time) (citations omitted).

### A. Cause under § 1112(b)(4)(A)

Under § 1112(b)(4), "a substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" supports the dismissal or conversion of a Chapter 11 case. As I noted previously, MORs filed in the case typically were filed late and often the initial version was only a summary sheet providing little information on Debtor's operations. These reports uniformly state that Debtor has not made any post-petition mortgage payments for properties other than the New York property and 2825 W. Girard Avenue property

11

or paid any real estate taxes since the inception of the case. Therefore, Debtor has incurred significant unpaid administrative expenses. Debtor has not accounted in any consistent manner for the accumulation of unpaid administrative expenses, so it is impossible to ascertain the amount of claims that will have to be paid on the effective date of the plan as required under 11 U.S.C. § 1129(a)(9)(A). This includes postpetition taxes incurred by the estate as provided in 11 U.S.C. § 503(b)(1)(B)(ii).

One measure of continuing loss in a bankruptcy case is negative cash flow after the case is commenced. *See In re 3868-70 White Plains Road, Inc.*, 28 B.R. 515, 518 (Bankr. S.D.N.Y. 1983) (finding the estate suffered continuous loss where "[t]he debtor has been unable to make any payments to its first mortgagee during the [six-month] pendency of this case"). Here, Debtor entered bankruptcy with significant arrearages having accumulated on several mortgage obligations and with substantial unpaid real estate taxes and municipal claims. These obligations have continued to grow since the petition was filed as post-petition payments on these obligations have not been made. Most concerning is that during the same two-year period that Debtor failed to pay administrative expenses of the estate, he paid out more than $27,000 in gifts. *See* Monthly Operating Report for the period ending September 30, 2016, Individual Debtor Personal Expenses, cumulative filing to date.

The MORs for April 2016 through September 2016 show negative net cash flow of $137.00. Nevertheless, Debtor insists that he can fund a plan through rents and his part time employment. The history of this case demonstrates otherwise.[11] Debtor attempts to demonstrate

---

[11]Even the information actually reported in the MORs is suspect. Many of Debtor's expenses that one would expect to vary month to month remained the same throughout the April through September 2016 period. For example, Debtor's auto expenses were $650 every month,

12

Case 1:14-bk-03454-MDF    Doc 451    Filed 12/27/16    Entered 12/28/16 08:57:56    Desc
Main Document    Page 12 of 19

that through a combination of rent payments and income from his employment he can make the payments proposed under the Sixth Amended Plan. But when Debtor explains how this will be accomplished, he employs a mathematical sleight of hand. He asserts that his income from his employment and the monthly rents are adequate to make all payments, but within this computation he fails to deduct his ordinary disbursements as an individual debtor from the total amount available to fund the plan. In other words, while he has deducted his plan payments from his income, he does not account for the payment of personal expenses or on-going property expenses.

An examination of the MORs for the reporting periods April 2016 through September 2016 shows that the average total monthly disbursements was $15,974.83. Debtor suggests that after making the proposed plan payments in the first phase of his plan he will have net income remaining of $5528.60. But if the average of his historic household and business expenses are considered, he will, in reality, have negative net income of approximately $10,000.

While Debtor may believe that he can "make the numbers work," I am not convinced. As the Supreme Court has stated "[h]owever honest in its efforts the debtor may be, and however sincere its motives, the [bankruptcy court] is not bound to clog its docket with visionary or impracticable schemes for resuscitation." *Tennessee Publ'g Co. v. Am. Nat'l Bank,* 299 U.S. 18, 22 (1936). "[T]here must be 'a reasonable possibility of a successful reorganization within a reasonable time.' " *United Sav. Ass'n v. Timbers of Inwood Forest Assocs.,* 484 U.S. 365, 376 (1988). "Courts usually require the debtor do more than manifest unsubstantiated hopes for a

---

repairs and maintenance (other than related to the leased properties) were $100 per month and utilities were $100 per month. Also casting doubt on the accuracy of these expenses is Debtor's filing of October 2016 MOR even before the month had ended.

successful reorganization." *In re Canal Place Ltd. P'ship,* 921 F.2d 569, 577 (5th Cir. 1991) *cited in In re Brown,* 951 F.2d 564, 572 (3d Cir. 1991). Where "repeatedly unsuccessful attempts at confirmation are likely to generate enormous administrative costs, often without increasing the likelihood of success, § 1112(b) recognizes the court's ability to curtail the process through the ultimate conversion or dismissal of the case." *In re Am. Capital Equip., LLC*, 688 F.3d 145, 162 (3d Cir. 2012) (quoting *In re Rand*, No. AZ-10-1160, No. 07-06801, 2010 WL 6259960, at *5 (B.A.P. 9th Cir., Dec. 7, 2010) (other citations omitted)); *see, also, In re Gateway*, 374 B.R. at 562 (observing that "the Court must look at the track record of the Debtor to determine if [he] is suffering losses or making gains"). Debtor was provided with several opportunities to reduce losses and make gains, but this has not been achieved. Therefore, dismissal of the case is warranted.

### B. Cause under 11 U.S.C. § 1112(b)(4)(F)

A Chapter 11 case may be dismissed if a debtor fails to file timely MORs or fails to meet other reporting requirements. MORs must be filed with the Court and with the U.S. Trustee twenty days after the end of the month being reported. Here, Debtor filed his first few reports in a timely manner, and they generally were complete with attached spreadsheets on each property detailing receipts and disbursements. Throughout most of the case, however, his MORs have been filed late, incomplete or both. The January 2015 and February 2015 reports were filed in April 2015. Beginning with the March 2015 report Debtor no longer provided detailed information on receipts and disbursements for each property, but lumped together rents for all

14

properties and disbursements for all properties.[12] The pattern of late and incomplete filings persisted up to the final filing before the hearing on October 18, 2016 with MORs for June, July, August, September and October 2016 being filed on October 7, 2016.

An "unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter" is cause to convert or dismiss a Chapter 11 case. 11 U.S.C. § 1112(b)(4)(F). Debtor has failed repeatedly to comply in a timely manner with one of the most fundamental filing and reporting requirements imposed on a Chapter 11 debtor. MORs are the vehicle by which debtors convey to the Court, creditors, and other parties in interest the progress a debtor is making toward reorganization. These reports are critical to analyzing whether a proposed reorganization plan is feasible and can be confirmed. In addition, the representations in a disclosure statement, typically set forth in optimistic terms, are measured against the reality reflected in a debtor's MORs. Late and incomplete filings complicate the task of review and breed distrust. In this case, Debtor's failure to file timely and complete MORs provides further support for dismissal of his case.

C. *Cause under § 1112(b)(4)(I)*

It is undisputed that real estate taxes are not being paid directly for any of Debtor's Philadelphia properties. Debtor has been making mortgage payments on the 2825 W. Girard Street property, but it is unclear whether the mortgage payment includes an escrow for taxes and insurance. His MORs clearly state that no real estate taxes have been paid during the two-year

---

[12]But even the detailed reports were difficult to decipher. Debtor combined on one spreadsheet both actual receipts and disbursements and projected income and expenses. Although both a debtor's actual performance and projections of future performance provide helpful information, it was difficult to determine, based on the documents submitted, which numbers reflected his actual performance and which were projections.

period since the petition was filed.[13] Therefore, I conclude that Debtor has failed to pay all real estate taxes that have become due over the past two years on at least some of his properties. This state of affairs is particularly concerning in this case because Debtor entered bankruptcy with significant unpaid real estate taxes and municipal assessments for properties he owns in the City of Philadelphia.

Section 1112(b)(4)(I) states that cause for dismissal of a Chapter 11 case includes the "failure timely to pay taxes owed after the date of the order for relief . . . ." 11 U.S.C. § 1112(b)(4)(I). This provision includes a debtor's failure to pay post-petition taxes of any kind. *In re Park*, 436 B.R. 811, 819 (Bankr. W.D. Va. 2010). Debtor's failure to pay post petition taxes further supports dismissal of this case.

   D. *Other cause for dismissal*

In most true reorganizations, a debtor looks for ways to cut costs and increase income. Debtor's reorganization has failed for several reasons unique to this case. Debtor has insisted on retaining all properties he owned when he filed his petition. Of the eight properties Debtor owns in his sole capacity, four generate little or no income, while at the same time incurring expenses for the estate. On several occasions I have suggested that Debtor consider disposing of unproductive assets, but to no avail. His decision to retain these assets has only allowed administrative tax claims to mount, inhibiting his reorganization efforts.

Not only has Debtor failed to reduce expenses, his anticipated increase in employment income has not materialized. Debtor had every expectation at the commencement of his case that

---

[13]The MOR form used for individual debtors in this District in 2014 when the case was filed did not require debtors to report on whether tax payments were current and, if delinquent, in what amounts.

he would be able to obtain employment as a lawyer following graduation from law school in 2015. When he was unable to become employed as a lawyer, Debtor was unable to find sufficiently remunerative employment to meet the goals of his plan.

The Objecting Creditors have complained that the Sixth Amended Disclosure Statement, like the prior versions, relies on a presumption of future increased earnings to fund the plan without corresponding evidence to justify the presumption. Property rentals are inadequate to satisfy all the ongoing obligations related to all the properties Debtor proposes to retain (including maintenance, utilities, taxes, and related expenses) while funding payments under the confirmed plan and paying all of debtor's living expenses and those of family members he is assisting. Therefore, at this point in the proceeding, even before a disclosure statement has been approved, I have determined that Debtor has insufficient income to finance a proposed plan as required under § 1129(a)(11).

After two years in bankruptcy there remain so many critical, unresolved issues, such as the fair market value of the properties secured by mortgages being impaired under the plan and the amount of unpaid administrative and priority claims. With so many unresolved issues, Debtor has been unable to submit a disclosure statement with adequate information as required by § 1125.

The Third Circuit has observed that creditors and the bankruptcy courts rely on the information in disclosure statements in evaluating the merits of Chapter 11 plans. *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988), *cert. denied*, 488 U.S. 967 (1988). "Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'" *Id.* As one bankruptcy

17

court has observed, simply submitting a document labeled as a "disclosure statement" does not necessarily lead to the conclusion that it contains the information required under the Bankruptcy Code. *In re Babayoff*, 445 B.R. 64, 77-79 (Bankr. E.D.N.Y. 2011). "To reap the benefit of chapter 11, the debtor must pay the price of disclosure; he or she needs to provide financial and other relevant information to the creditors to inform them and the Court about the progress and the status of the case." In re *Tornheim*, 181 B.R. 161, 164 (Bankr. S.D.N.Y. 1995).

After more than two years in bankruptcy, Debtor has not demonstrated that he will be able to confirm a Chapter 11 plan. He has refused to make the necessary concessions that would make confirmation of a realistic plan possible. He complains about late filed claims, but he has never requested a bar date. He stubbornly insists that he has the resources to fund the plan he has proposed, but offers little hard data to justify his optimism.

*E. No unusual circumstances exist to avoid dismissal*

Once a bankruptcy court finds cause to dismiss or convert a case under § 1112(b), the burden shifts to the debtor to show that "unusual circumstances" exist that converting or dismissing the case would not be in the best interest of creditors and the estate, that a plan will be confirmed within a reasonable time and that cause under § 1112(b)(4), other than under (b)(4)(C) will be cured within a reasonable period of time. 11 U.S.C. § 1112(b)(2). Debtor has not offered any unusual circumstance to justify a decision not to dismiss this case. It has been his steadfast position that he has submitted adequate information, that his proposed plan should be confirmed
and is feasible, and that the delay in the case is attributable to the actions of the Objecting Creditors.

18

### III. Conclusion

As I observed in footnote 2 of this Opinion, Debtor's case must be dismissed because he did not obtain prepetition credit counseling. But even if this deficiency did not exist, I must either dismiss or convert the case having found cause for conversion or dismissal and not having found the existence of "unusual circumstances." Upon consideration of the entire docket and history of this case, I believe that dismissal is in the best interest of creditors and the estate. While it is possible that the New York property may be worth significantly more than Debtor has reported, it would be pure speculation for me to reach such a conclusion on the record before me. There is no reason to believe that any of the other properties have equity and, in fact, every reason to believe that the position of creditors secured by the Philadelphia properties, other than LSF9 secured by 2825 W. Girard Avenue, has seriously eroded since the case was filed. Only creditors with mortgages against the New York property and LSF9 appear to be fully secured. After being served with the Order directing Debtor to show cause why the case should not be dismissed, none of the Objecting Creditors indicated any opposition to dismissal of the case. Accordingly, an order will be entered dismissing the case.

By the Court,

Dated: December 27, 2016

*Mary D France*
Bankruptcy Judge
(VK)